DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

CHRISTINA McCALL (CABN 234139)
VANESSA BAEHR-JONES (CABN 281715)
JONAS LERMAN (CABN 274733)
Assistant United States Attorneys

1301 Clay Street, Suite 340S
Oakland, California 94612
Telephone: (510) 637-3680
Christina.Mccall@usdoj.gov
Vanessa.Baehr-Jones@usdoj.gov
Jonas.Lerman@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DAVID JOHN TELLES, JR.,<br><br>Defendant. | No. CR 16-00424 JSW<br><br>UNITED STATES' SENTENTING RECOMMENDATION |

# TABLE OF CONTENTS

INTRODUCTION ..... 1

BACKGROUND ..... 1

A. Factual Background ..... 1

B. Defendant's Attempts to Delay Trial and Obstruct Justice ..... 5

SENTENCING ARGUMENT ..... 7

A. Statutory Potential Penalties ..... 7

B. Sentencing Guidelines ..... 7

1. Offense Level Calculations ..... 7

2. Obstruction of Justice ..... 7

3. Criminal History ..... 10

C. The Nature of the Offenses ..... 11

D. Characteristics of Defendant ..... 11

E. Promote Respect for the Law, Protect the Public, Punishment and Deterrence ..... 12

F. Restitution ..... 13

**TABLE OF AUTHORITIES**

*Page(s)*

*Statutes*

18 U.S.C. §3583(k) ........ 7
18 U.S.C. § 3553(a)(2)(A) ........ 12
18 U.S.C. § 3585 ........ 10
18 U.S.C. § 3664(d)(5) ........ 13

*Rules*

Federal Rule of Criminal Procedure 43 ........ 9
U.S.S.G. § 2G1.3 ........ 7
U.S.S.G. § 2G1.3(b)(2) ........ 7
U.S.S.G. § 2G1.3(b)(3) ........ 7
U.S.S.G. § 2G1.3(b)(3)(A) ........ 7
U.S.S.G. § 3C1.1 ........ 7, 8, 10
U.S.S.G. § 3E1.1 ........ 7
U.S.S.G. § 4B1.5(b)(1) ........ 7, 8, 10

## INTRODUCTION

Starting in May 2014, a 38-year-old man, defendant David John Telles, Jr., exchanged hundreds of electronic messages with a 14-year-old girl (the Minor Victim), grooming her to engage in sexual acts and ultimately convincing her to run away with him. On June 15, 2014, the Minor Victim disappeared from her home in southwest England. When police apprehended defendant two days later, they found him with the Minor Victim outside a pub near the city of Exeter, United Kingdom (U.K.). During the resulting investigation, led by the Devon and Cornwall Police Department, U.K. police recovered physical evidence demonstrating that during those two days defendant had sexually abused the Minor Victim.

For these crimes, defendant was prosecuted and convicted in the U.K. for Abducting a Child and Sexual Activity with a Child, among other charges, and sentenced to six years' imprisonment, of which he served approximately two years. PSR ¶ 59. On October 13, 2016, the grand jury charged defendant with enticing the Minor Victim online, traveling abroad to engage in illicit sexual conduct with her, and engaging in illicit sexual conduct with her in a foreign place. Dkt. #1. On October 29, 2018, the trial jury found defendant guilty of all three charged counts. Dkt. #305.

For the reasons set forth below, the United States respectfully requests that the Court sentence defendant to 297 months of imprisonment, a lifetime of supervised release, a $300 special assessment, and restitution (in an amount to be determined), for his egregious conduct in this case. This sentence takes into account the serious nature and circumstances of the offense, defendant's history and characteristics, promotes respect for the law, affords adequate deterrence, and protects the public from future crimes of the defendant. The United States believes this sentence is sufficient, but not greater than necessary, to accomplish the goals of sentencing.

## BACKGROUND

### A. Factual Background

Between April and June 2014, while residing in the U.K., the 14-year-old Minor Victim had been in communication via Clash of Clans, an online game, and Kik Messenger, a mobile texting application with defendant, who resided within the Northern District of California. Defendant initially

pretended to be his 14-year-old son, using an account in his son's name, talking about high school sports and sending photos of his then-14-year-old son. Trial Exhibit 336; Presentence Report (PSR) ¶ 7. Only when the Minor Victim believed she was "in love" with the 14-year-old boy and in a boyfriend-girlfriend relationship, did defendant reveal his true age to her. PSR ¶ 18.

Defendant engaged in very sexually explicit conversations with the Minor Victim, often through Kik messenger. Some examples of defendant's sexually explicit communications were displayed in Trial Exhibits 314, 327, 331, 332, 334. Defendant also made a number of phone calls to the Minor Victim in this period. Exhibit 216.

Defendant knew the Minor Victim's age (barely 14) from many sources of information, including from the copy of her passport biographical page that he saved to his smartphone on June 12, 2014. Exhibit 24. The same date that defendant saved the Minor Victim's passport to his phone, he bought a plane ticket that would arrive in England on June 15, 2014, and return on June 17, 2014. Exhibit 212. While planning his trip, defendant told the Minor Victim that he "talked to [his teenage children] about everything . . . marriage new mom . . . [his daughter] keeps asking your age tho . . . this part will be hard . . . we have to say older . . . Like 18 maybe 17." Exhibit 80.

It appeared defendant's online exploitation of the Minor Victim may not have been an isolated [redacted]

On June 13, 2014, defendant obtained a United States passport, indicating in the application that he was planning to travel to England between June 14, to 17, 2014. Trial Transcript at 682. Defendant

---

[redacted]

also purchased an engagement ring, listing the Minor Victim's first name as his "spouse." Exhibit 200. On June 14, 2014, defendant flew from Oakland International Airport to London Heathrow airport, through a series of connecting flights. Trial Transcript at 675-78. Defendant suggested that the Minor Victim pack "as much as you can with out it obvious . . . And all your money . . . Clear maps and phone." Exhibit 80.

The morning of June 15, 2014, defendant rented a car near Heathrow airport. Exhibit 214. Defendant had a number of condoms in his luggage. Trial Transcript at 218-19; Exhibits 244, 245.

On June 16, 2014, at approximately 8:38 a.m., Devon and Cornwall Police received a call from the mother of the Minor Victim, who reported her daughter as missing. Dkt. #101-2 at 1. Shortly thereafter, the dispatcher began mobilizing local police units to search for the Minor Victim, contacting hospitals, and circulating photographs of the Minor Victim. *Id*. at 2–5. At 5:57 p.m., police received an update from the Minor Victim's mother who had found notes in the victim's school book showing the victim may have been planning to travel to California. *Id*. at 6. Throughout that day and night, police continued to attempt to locate the Minor Victim. *Id*.

On June 17, 2014, at around 8:30 a.m., police were able to obtain defendant's phone number after the Minor Victim's family unlocked the victim's phone and noticed a suspect phone number communicating with the Minor Victim. *Id*. at 16. Records that the police obtained from Google, Inc. showed that a David Telles of Pleasanton, California, was using this phone number. *Id*. at 18. By 11:47 a.m., police had apprehended defendant in his vehicle, outside a pub, and recovered the Minor Victim. *Id*. at 23.

During the trial, the Minor Victim testified about how Telles engaged in sexual activity with her:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

[page contents redacted]



.

The Minor Victim testified about what the defendant was telling her as the police were searching for her in 2014:

> Q. WHAT WERE THE -- SOME OF THE THINGS THAT DEFENDANT WAS TELLING YOU THAT MORNING [of Defendant's arrest]?
> A. THAT HE WAS UPSET AND ANGRY AND WAS WORRIED, YET HE SAID WE DID NOTHING WRONG SO THERE IS NOTHING TO WORRY ABOUT. BUT THEN HE WENT BACK ON THAT AND SAID THAT I SHOULDN'T TELL ANYONE WHAT HAPPENED BECAUSE HE'LL GET IN TROUBLE. HE WILL END UP GOING TO PRISON. HE WILL LEAVE HIS KIDS, AND THAT THAT WILL BE ON ME. AND THAT BECAUSE HE HAS A HERNIA IF SOMEONE HITS IT, THEN IT WILL RUPTURE AND LIKE BLEED EVERYWHERE AND HE WILL AUTOMATICALLY DIE, WHICH WILL MAKE ME A MURDERER.
> . . .
> Q. DID DEFENDANT SAY ANYTHING -- WHAT, IF ANYTHING, DID THE DEFENDANT SAY ABOUT YOU BEING IN TROUBLE, TOO?
> . . .
> THE WITNESS: BECAUSE I LIED ABOUT MY AGE SUPPOSEDLY, WHICH I DIDN'T, THAT I WOULD BE IN A LOT OF TROUBLE AND GO TO PRISON FOR IT BASICALLY.
> Trial Transcript at 557-58.

Exhibit 287 is the message that defendant was typing to the Minor Victim when her father and police were searching for her: "With every? U lead him to me he will he will have me arrested he is trying to find us he lying if up don't tell him we r I am arrested think off kids he is still trying time get info for pollca [sic]." When defendant was arrested, police found the Minor Victim's passport inside defendant's luggage. Exhibit 253.

**B. Defendant's Attempts to Delay Trial and Obstruct Justice**

The defendant exhibited a pattern of dilatory behavior in the months leading up to trial. He requested to change counsel three times; refused to cooperate with his counsel; requested to represent himself and indicated to the Court that his first act in representing himself would be to move for a delay;

obstructed a mental health examination by the government's expert, Dr. Dan Martell, by moving slowly, requesting phone calls to his attorney, providing vague or unresponsive answers or refusing to answer entirely, and taking an extraordinarily long time to complete a test written at a fourth-grade reading level; and, finally, during the first day of jury selection, refused to change into civilian clothes his family brought him to wear.  (Dkt. #30 (AFPD Smock's Motion to Withdraw); #34 (Criminal Minute Order June 13, 2017); #66 (Criminal Minute Order February 13, 2018); #94 (Order Setting Status Conference); #95 (Criminal Minute Order June 12, 2018); #122 (Order Setting Status Conference); #131-1 (Transcript of September 4, 2018 Hearing) at 3; #131-2 (Transcript of June 12, 2018 Hearing) at 5-8; #141 (Transcript of September 7, 2018 Hearing) at 14-22; #219 (Order Denying Motion to Proceed Pro Se); #243-1 (Dr. Martell's Report); and #334 (Feigelson Decl.) ¶¶ 3-5.

The defendant also, on multiple occasions, instructed prospective witnesses (his family) to refuse to cooperate with his defense attorneys. Dkt. #243-4 (Review of Jail Calls) at 83, 93; Dkt. #368.

After two days of jury selection, and when the Court was preparing to reconvene to discuss the government's motion to exclude defendant's proposed mental health expert, defendant was found unresponsive and was transported to a hospital. Dkt. #251 (Criminal Minute Order October 12, 2018); Dkt. #359 (Transcript of October 12, 2018 Hearing) at 41-42.  Defendant remained unresponsive for six days, during which time several physicians treated him.  Beginning on Monday, October 15, 2018, some of the defendant's treating physicians testified that they had conducted multiple physiological tests, the results of which showed there was nothing physically wrong with him. Dkt. #325 (Transcript of October 15, 2018 evidentiary hearing ("Oct. 15 Tr.")) at 15.  Two physicians, including a forensic psychiatrist, concluded that the defendant was malingering, and law enforcement officials testified that they observed behaviors during the defendant's period of unresponsiveness that suggested he was conscious and aware. *See generally* Dkt. #325 ("Oct. 15 Tr."); #326 (Transcript of October 16, 2018 evidentiary hearing ("Oct. 16 Tr."); and Dkt. #368.  The evidentiary hearing necessitated a two-day continuance of the trial, while many international witnesses waited to testify.

On October 23, 2018, toward the end of the trial, after the Minor Victim testified and was departing the courtroom, the defendant stood up, took off his jacket, threw himself to the floor, and pretended to be unconscious. Dkt. #335 (Ex. 3).  The paramedics who responded to the courtroom

determined that the defendant's vital signs were normal. Dkt. #329 ¶ 4. The next morning, while trial proceeded, the defendant again feigned unresponsiveness, again had normal vital signs, and chose to go to court instead of the Santa Rita Jail's medical wing. *Id.* ¶ 5. On October 25, 2018, during a short stretch break, the defendant made eye contact with the Minor Victim and mouthed, "I love you. Remember I love you." Dkt. #330. Defendant again mouthed those words to the Minor Victim on October 29, 2018, during the reading of the verdict. *Id.*

## SENTENCING ARGUMENT

### A. Statutory Potential Penalties

The government agrees with the Presentence Report's recitation of the statutory maximum terms of imprisonment (life for Count 1, and 30 years for Counts 2 and 3) for these serious offenses, and the mandatory term of imprisonment of 10 years for Count 1. PSR ¶ 94. The Court may sentence defendant to a lifetime of Supervised Release, with a minimum of five years. 18 U.S.C. §3583(k).

### B. Sentencing Guidelines

#### 1. Offense Level Calculations

As set forth in the Presentence Report, the total adjusted offense level is 41, after applying a base offense level of 28 (U.S.S.G. §2G1.3), application of specific offense characteristics reflecting misrepresentation of the defendant's identity (pretending to be his 14-year-old son) (2-level, §2G1.3(b)(2)), use of a computer/computer service (Kik messenger and Clash of Clans) (2-level, §2G1.3(b)(3)), committing a sexual act on a minor (2-level, §2G1.3(b)(3)(A)), an adjustment for obstruction of justice (2-level, §3C1.1), and engaging in a pattern of activity involving prohibited sexual conduct (5-level, §4B1.5(b)(1)). Defendant's actions—repeated sexual abuse of the minor in two different locations and using many different methods—certainly warrant the 5-level increase. See PSR ¶ ¶ 10, 11, 12. Defendant never demonstrated full acceptance of responsibility at any point in this case, even after the jury verdict, so no reduction is appropriate under U.S.S.G. §3E1.1. The Probation Office's calculations are the same as the government's. PSR ¶¶ 46-56.

#### 2. Obstruction of Justice

Defendant is subject to the obstruction enhancement under U.S.S.G. § 3C1.1, which applies if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of

justice" with respect to the prosecution of the offense of conviction. U.S.S.G. § 3C1.1. Application Note 4 sets forth examples of the types of conduct to which this adjustment is intended to apply, and includes: "(A) threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so;" and "(K) threatening the victim of the offense in an attempt to prevent the victim from reporting the conduct constituting the offense of conviction."

Shortly before his arrest, the defendant began to obstruct justice by unlawfully influencing the Minor Victim, telling her that she should not tell anyone what happened because defendant would get in trouble. Transcript at 557. Defendant told the Minor Victim that if she did tell, he would go to prison, meaning he would leave his children, and that would be the Minor Victim's fault. *Id*. Defendant told the Minor Victim that, because of his hernia, it someone hits it, it will rupture and bleed everywhere, causing him to die, which would make the Minor Victim a murderer. *Id*. Defendant also told the Minor Victim that she would also be in trouble because he claimed she lied about her age, and she would also go to prison. *Id*. at 557-58. The text message that defendant was typing to the Minor Victim when her father and police were searching for her is consistent with the defendant's early attempts to dissuade the victim: "With every? U lead him to me he will he will have me arrested he is trying to find us he lying if up don't tell him we r I am arrested think off kids he is still trying time get info for pollca [sic]."

As the Court found in its Order Denying Defendant's Motion for Judgment of Acquittal and for New Trial (Dkt. #368), and as explained above, defendant exhibited a pattern of dilatory leading up to trial. Defendant instructed his family members (potential witnesses) not to cooperate with his attorneys. See, e.g., Dkt. #242, Exhibit 4 at 83 ("Tell them to give me that email and tell them to notify the judge, as critical witnesses you will not cooperate with these lawyers.") *id*. at 93: ("Can you make sure to tell, you know, grandma, and poppa and [ ] not to talk to anybody. My lawyers, the prosecution, the police, any of the experts you know that you've emailed and stuff like that? . . . Absolutely no talking to anybody at this point.") Defendant obstructed a court-ordered mental health examination by the government's expert. And defendant refused to change into civilian clothes his family brought him to wear on the first day of jury selection.

When the trial started, defendant increased his attempts to obstruct the administration of justice. After two days of jury selection, and when the Court was preparing to reconvene to discuss the

government's motion to exclude the defendant's proposed mental health expert, the defendant feigned unresponsiveness and was transported to a hospital. Defendant was unresponsive for six days, causing the trial to largely grind to a halt. Defendant's treating physicians testified that they had conducted multiple physiological tests, the results of which showed there was nothing physically wrong with the defendant. Two physicians, including a forensic psychiatrist, concluded that the defendant was malingering, and law enforcement officials testified that they observed behaviors during the defendant's period of unresponsiveness that suggested he was conscious and aware.

The Court correctly found, based on all the evidence, including medical records, that defendant was malingering, determined that he had voluntarily absented himself under Federal Rule of Criminal Procedure 43, and, accordingly, ordered that trial would proceed the next day. Dkt. #326 at 111: ("the court is unable to estimate when Mr. Telles will decide to cease his charade"). Late in the first day of trial, defendant completely roused himself, complained about the noise from the trial being broadcast in his room, and said he wanted to eat lunch (Dkt. #333). He was present in Court for the second day of trial. Dkt. #368.

Defendant also tried to influence the Minor Victim's testimony inside the courtroom. When asked if she was able to recognize the person she knew as "David" in the court room, defendant quickly reached up, pulled the band holding the pony tail out, and fluffed out his hair so it fell down around his shoulders, making him appear different from his military-style haircut when the Minor Victim last saw him in 2014. PSR ¶ 37. The following day, on October 23, 2018, after the Minor Victim testified and stepped down from the witness stand, defendant threw himself to the floor and pretended to be unconscious. *Id.* When paramedics responded to the courtroom, it was determined all of the defendant's vital signs were normal. *Id.* "As soon as we were outside of the courtroom [after the victim testified], I noticed how greatly rattled and distressed the Minor Victim appeared to be as a result of the incident. She immediately expressed to me her concern that defendant's apparent fall to the ground was the result of a hernia that he had previously told her about." Ono Declaration (Dkt. #330)." "The Minor Victim had told me before that one of the last things defendant had told her before he was arrested in England was that he had a hernia and that if he was in jail and someone hit it and/or ruptured it, he would die and the Minor Victim would be a murderer. The rest of the afternoon and the next day, the

Minor Victim remained visibly upset about the incident." *Id*.

When the Medical Doctor at Santa Rita jail examined defendant after he was transported from court, he had normally functioning heart, lungs, and reflexes. Dkt. 339, Declaration of Dr. Molitorisz ¶ 4. Shortly after the doctor completed the examination, defendant spontaneously got dressed in his room and ambulated without difficulty (*id*.), providing further evidence that defendant's collapsing to the floor as the Minor Victim left the stand was an attempt to obstruct justice, influence the Minor Victim, and attempt to cause his own mistrial. The next morning, while trial proceeded, defendant again feigned unresponsiveness, again had normal vital signs, and chose to go to court instead of the Santa Rita Jail's medical wing. Dkt. #329, Searls declaration ¶ 5.

Defendant also tried to communicate with the Minor Victim during across the courtroom during closing arguments and during the reading of the verdict, which appeared to cause the Minor Victim distress. Dkt. #330, Ono Declaration ¶¶ 5-8. Additionally, during the reading of the verdict, the defendant appeared to mouth the word "you" multiple times toward the victim in synchronization with his finger pointing toward her." Dkt. #332, Lessard Declaration ¶¶ 5-7.

For all of the reasons set forth in this section, the defendant has certainly earned a 2-level enhancement for obstruction of justice under USSG § 3C1.1.

**3. Criminal History**

The Government agrees with the Probation Department's criminal history computations. Defendant's only prior convictions relate to this offense, so his criminal history score is zero and his criminal history category is I. PSR ¶¶ 59-60. As to each of the counts of conviction, based upon a total offense level of 41 and a criminal history category of I, the guideline imprisonment range is 324 months to 405 months. PSR ¶ 95. The government recommends that the Court consider a downward departure to account for the 27 months that defendant spent in custody in England for related offenses, since that time would not otherwise be credited to his federal sentence. *See* 18 U.S.C. § 3585; and Bureau of Prisons Program Statement 5880.28 ("Credit will not be given for any portion of time spent serving another sentence regardless of whether the sentence is federal, state, or foreign.")

///

///

**C. The Nature of the Offenses**

These offenses involved a vulnerable victim, who was just 14 years old when defendant encouraged her to run away from home (packing her money and clearing her phone and maps). The Minor Victim testified about the difficult time she faced when she encountered the defendant. Transcript at 472, 473, 480, 489-90, 510, 565-66. Detective Thomas, who interviewed the Minor Victim shortly after she was rescued, testified: "My observation she was a very vulnerable child, very shocked and withdrawn about what happened over the last 24 hours." Transcript 201. The Minor Victim may attend the sentencing hearing, and the government will elaborate on the impact that defendant's crimes have had on her at that hearing.

Knowing the 24-year age difference between himself and the Minor Victim, and having children the Minor Victim's age, defendant still envisioned and carried out a plan to groom her, then fly halfway across the world to sexually abuse her. The way that the defendant treated the Minor Victim is [redacted]

**D. Characteristics of Defendant**

Unlike other defendants in child sexual exploitation cases who express extreme remorse and full acceptance of responsibility and who take steps to address the problems that led them to their criminal conduct (*see*, e.g.: CR 15-0330 (*U.S. v. Conway*), Dkt. #39-1 at 2-5; CR 14-0545 (*U.S. v. Blake Johnston*), Dkt. #67 at 30-31; CR 17-0516 (*U.S. v. Redic*), Dkt. #67 at 8; CR 18-0186 (*U.S. v. Provost*) Dkt. #22 at 8), defendant insists that he has done nothing wrong, and refuses to take any responsibility for his actions. PSR ¶ 64. Even after a jury found him guilty of all charges, and in the face of overwhelming evidence, defendant refused to speak with the United States Probation Officer unless he

could only present evidence of his "innocence." *Id.*

Defendant engaged in a sustained campaign to attempt to delay, then derail his trial. *See* Order Denying Defendant's Motion for Judgment of Acquittal and for New Trial (Dkt. No. 368). When defendant failed in his attempt to fire his third set of court-appointed attorneys, and failed to continue the trial, he feigned unconsciousness multiple times and engaged in calculated attempts to obtain a mistrial after the jury was already selected. When the Minor Victim finished testifying, defendant stood up, took off his jacket, threw himself to the floor, and pretended to be unconscious, which greatly rattled and distressed the Minor Victim, and caused the jury to be immediately ushered out of the courtroom. Dkt. #335, 330. When the jury announced its verdict, defendant mouthed the word "you" multiple times toward the victim in synchronization with his finger pointing toward the Minor Victim. Dkt. #332. This defendant's characteristics, as displayed from 2014 through 2019, demonstrate that he has little respect for the Minor Victim, for his family members, or for the system of justice in the United States.

**E. Promote Respect for the Law, Protect the Public, Punishment and Deterrence**

The government respectfully submits that the recommended sentence of 297 months' imprisonment "reflect[s] the seriousness of the offense," "promote[s] respect for the law," and "provide[s] just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A). The recommended sentence should deter defendant and others from grooming children online, and traveling internationally to molest them. Such a lengthy sentence, plus a lifetime of Supervised Release, would also protect the public from defendant's future crimes. Finally, in light of defendant's history and characteristics, including his multiple attempts to intimidate the Minor Victim before he was arrested and during trial, his multiple attempts to obstruct justice, and the egregious nature of the sexual offenses against a child, a 297-month sentence would provide just punishment.

///

///

///

///

///

///

**F. Restitution**

Pursuant to 18 U.S.C. § 3664(d)(5), undersigned counsel informs the Court that the victim's losses are not ascertainable 10 days prior to sentencing, and requests that the Court set a date for the final determination of the Minor Victim's losses and set a restitution hearing within 90 days of the sentencing hearing.

DATED: June 12, 2019

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

***/s/ Christina McCall***

CHRISTINA McCALL
VANESSA BAEHR-JONES
JONAS LERMAN
Assistant United States Attorneys