1  MICHAEL STEPANIAN (CSBN 037712)
2  JENNIFER L. NAEGELE (CBN 232643)
   Attorneys at Law
3  819 Eddy Street
   San Francisco, CA 94109
4  Telephone: (415) 771-6174
   Facsimile:  (415) 474-3748
5
   Attorneys for Defendant
6  DAVID JOHN TELLES, JR.

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                    SAN FRANCISCO DIVISION

11  UNITED STATES OF AMERICA,          Case Nos. 4:16-cr-00424-JSW

12                                     **DEFENDANT'S SENTENCING**
            Plaintiff,                 **MEMORANDUM**
13
                                       Date:  June 18, 2019
14        v.                           Time:  1:00 p.m.
                                       Judge: Honorable Jeffrey S. White
15  DAVID JOHN TELLES, JR.,                    United States District Judge
                                              Courtroom 5 – 2nd Floor
16
            Defendant.
17

18

19

20

21

22

23

24

25

26

27

28

                                      i

# TABLE OF CONTENTS

I.  INTRODUCTION AND BACKGROUND ..........................................................................1

II.  DISCUSSION ......................................................................................................................3

  A.  THE SENTENCING GUIDELINES ARE ADVISORY ................................................3

  B.  OBJECTIONS TO THE GUIDELINES RANGE IN THE PSR ....................................4

    1.  Enhancement for Use of a Computer Constitutes Double-Counting. .............................5

    2.  Obstruction of Justice Enhancement Is Not Supported by the Facts. ............................6

    3.  Mr. Telles Is Not a "Repeat and Dangerous Sex Offender Against Minors." .................8

    4.  Mr. Telles Is Eligible for a Downward Departure for His Mental Condition. ...............10

    5.  Mr. Telles Is Eligible for a Downward Departure Based on Time Served in England. .10

    6.  Summary of Proper Offense Level. ...............................................................................11

  C.  RELEVANT CHARACTERISTICS & FACTORS SUPPORTING VARIANCE. .......12

    1.  Aberrant Conduct .........................................................................................................12

    2.  Low Risk of Recidivism ...............................................................................................14

    3.  Mental Defects and Disorders ......................................................................................15

    4.  Traumatic Past ..............................................................................................................19

    5.  Support of Family .........................................................................................................19

    6.  Excellent Employment History .....................................................................................21

    7.  Collateral Consequences in Addition to Incarceration .................................................22

    8.  Vulnerability to Abuse and Victimization in Prison .....................................................23

III.  CONCLUSION ..................................................................................................................24

ii

*Defendant's Sentencing Memorandum, Case Nos. 4:16-cr-00424-JSW*

# I.  INTRODUCTION AND BACKGROUND

It would be easy for anyone who comes into contact with David Telles to become angry with him for both his attitude and the crimes for which he was convicted. Much has gone downhill since his incarceration in the United States: anger towards the lawyers who are/were representing him; a bad attitude towards the United States Marshals; rude behavior in court proceedings; turning down a reasonable plea agreement; disrespect for court-appointed professionals; cranky conduct; obnoxious behavior.

Being angry at lawyers may be the form these days, especially with the numerous jailhouse lawyers skulking around. Disrespecting a psychiatrist retained by the government and appointed by the Court might also be rationalized. But irritating a probation officer, refusing to meet with a defense-retained psychiatrist, and bossing around parents and children elicits no sympathy. The only rationale for this obnoxious, rude behavior is that Mr. Telles is mentally disturbed.

One reason for this abuse towards all who represent him is that he is in actuality a sad, lonely human being with no friends, no happy future, and no ability to conduct himself in normal behavior. His parents are sweet, decent people, whom he has bullied on the telephone during his incarceration, most recently by demanding that they not communicate with the Probation Officer. His children are extremely competent. His daughter, whom counsel has met, is a lovely person doing very well at Georgetown University. His son is quite bright, and while overcoming some learning difficulties, was nonetheless accepted to our most prestigious universities. It would be easier to rationalize Mr. Telles's behavior if he had abusive parents who neglected him, beat him, or were unable to care for themselves with drug and mental disease, but that is not the case here. His parents communicate well; they understand his deficiencies; they came to court proceedings; they were present during the trial and very encouraging to trial counsel.

Prior to the instant offense, David Telles had no criminal history whatsoever and had never been arrested. This case is aberrant conduct taken to the extreme. He has never been accused of unusual sexual behavior and did not have any child pornography on his computer. He is not a

*Defendant's Sentencing Memorandum, Case Nos. 4:16-cr-00424-JSW*

sexual predator of young women or children. David Telles engaged in one isolated instance—albeit terribly wrong according to the jury—in a lifetime. He has no history of predation at all.

That said, this kind of incident does not typically happen in isolation. In fact, David Telles had been bullied throughout his life.[1]  He had few friends growing up and no concept of social behavior. He stuttered and dressed oddly. He had terrible reading abilities and was inarticulate, no social graces, never dated, never drank, never went to parties. He was never intimate with a woman until his marriage. His mundane daily needs were administered mostly by his family. His wife perhaps committed suicide or overdosed on drugs. In any case, she was unbalanced. His habits of hoarding made his house a mess. Every time he had a jail interview, he would have piles of paper with scribblings on tissue, toilet paper, and paper towels.

There is no question that David Telles suffers from a mental disorder. He believed he was saving the life of this young English woman from molestations from a parent and teachers. No matter how many times lawyers told him that this flies in the face of his not taking her to the local police station or hospital but instead taking her to a hotel room with a one-way ticket home after discussing salacious things on the internet, he refuses to believe that this was a delusion. Whenever there were conversations attempting to develop a theory of his intent, the exchange ran into an emotional dead-end. It is sad that he refuses to adjust his focus from minutia on irrelevant details and cannot see the forest for the trees. The idea of him having a 15-year old girlfriend named Corrina is patently absurd. He has no ability to have a girlfriend, either online or otherwise.

Dr. Kellaher was sympathetic to him and fortunately obtained statements to give the Court an idea of what Mr. Telles was like growing up. If it were not for Dr. Kellaher, we would never have known of these mitigating factors. He never discussed his phobias, collections, preferences, or need to focus on minutia with his lawyers.

Indeed, Mr. Telles was unable to communicate or assist in his defense with three competent prior lawyers. He seems incapable of forming a strategy or truly understanding how the legal

---

[1] The Probation report contains personal history that was derived from the interview and report of Dr. Kellaher. Portions of Mr. Telles's personal history were forwarded to Officer Mar.

*Defendant's Sentencing Memorandum, Case Nos. 4:16-cr-00424-JSW*

proceedings around him operate. To this day, he continually refuses to cooperate in formulating any kind of a strategy to help himself. The concept of purposefully hurting himself by irritating everybody who wants to help him, including the Probation Officer and defense psychiatrist, seems so self-destructive that it can only be explained by a mental defect or delusion. It is the only explanation. To state that he does not care about receiving three life sentences in open court is obviously self-destructive. Why would a person, even though he is appealing his case, do everything to give himself a severe sentence? Any competent person would never be so absurd.

The defense respectfully submits that David Telles should be sentenced to 10 years in prison, a long time. This is enough. With psychological help, this will be sufficient to teach him a lesson. He is a very good, doting father who has two wonderful kids. He has value and needs time to straighten himself out. Undersigned counsel is hopeful in this day and age that our citizens suffering from anxiety and angry sentiment will change in time. This might be the reason we have criminal lawyers: we are sometimes foolish enough to believe society will right itself.

## II.    DISCUSSION

## A.    THE SENTENCING GUIDELINES ARE ADVISORY.

In determining an appropriate sentence, the district court must consider both the advisory guideline range and the statutory factors set forth in 18 U.S.C. § 3553(a). *United States v. Booker*, 543 U.S. 220 (2005). Under *Booker*, sentencing courts must treat the Sentencing Guidelines as just one of a number of sentencing factors set forth in 18 U.S.C. § 3553(a). *Id.*

The overarching goal of 18 U.S.C. § 3553 is that the Court impose a sentence "sufficient, but not greater than necessary" to accomplish the purposes of sentencing established by Congress. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). Those purposes are: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). Key considerations include the nature and circumstances of the offense, the

3

history and characteristics of the defendant, the kinds of sentences available, the need to avoid unwarranted sentence disparities among similarly situated defendants, and the need to provide restitution to the victims. 18 U.S.C. § 3553(a). Under 18 U.S.C. § 3582, the Court is required to "recogniz[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation."

The Ninth Circuit has repeatedly acknowledged that "extraordinary circumstances are not needed to justify a sentence outside the guidelines range and [the court of appeal] must give due deference to the district court's decision that the sentencing factors warrant a particular variance." *United States v. Ruff*, 535 F.3d 999, 1002 (9th Cir. 2008); *United States v. Carty*, 520 F.3d 984, 991, 993 (9th Cir. 2008) (en banc); see also *Gall v. United States*, 128 S. Ct. 586, 595-597 (2007). "This standard reflects the common theme throughout the Supreme Court's recent sentencing decisions—to 'breathe life into the authority of district court judges to engage in individualized sentencing.'" *Ruff*, 535 F.3d at 1002 (internal quotation marks omitted).

## B.   OBJECTIONS TO THE GUIDELINES RANGE IN THE PSR.

The Guidelines calculation set forth in the PSR is as follows:

| | |
|---|---|
| 28 | Base Offense Level (USSG §2G1.3(a)((3)) |
| +2 | Misrepresentation of Identity (USSG §2G1.3(b)(2)(A)) |
| +2 | Use of a Computer (USSG §2G1.3(b)(3)(A)) |
| +2 | Sex Act (USSG §2G1.3(4)(A)) |
| +2 | Obstruction of Justice (USSG §3C1.1) |
| +5 | Repeat and Dangerous Sex Offender (USSG §4B1.5(b)(1)) |
| =41 | Total Offense Level |

With a Criminal History Category I and a total offense level of 41, the advisory sentencing range is 324 to 405 months in custody, and the mandatory minimum term of imprisonment for Count One is 10 years. Probation is recommending a downward variance to 264 months.

The defense appreciates the Probation Officer's recognition that a variance is warranted in this case due to the defendant's Autism Spectrum Disorder (ASD) diagnosis; the 2.25 years of custody time served in England; his gullibility associated with his ASD; trauma from his wife's

death; his supportive parents; role as dedicated father of two successful children; lack of criminal history; and his stable employment history. PSR ¶ 113 and Sentencing Recommendation.

The defense further respectfully submits that (1) the Guidelines calculation above is flawed and thus the total offense level is overstated; and (2) a further variance is justified here.

### 1. Enhancement for Use of a Computer Constitutes Double-Counting.

Defendant objects to the two-level enhancement for use of a computer under USSG §2G1.3(b)(3)(A). The offense level for this Guidelines calculation is based on Mr. Telles's conviction for Count One under 18 U.S.C. § 2422(b), "Online Enticement." PSR ¶ 1; see 18 U.S.C.A. § 2422(b) ("Whoever, *using the mail or any facility or means of interstate or foreign commerce*, or within the special maritime and territorial jurisdiction of the United States knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than 10 years or for life.") (emphasis added).

Impermissible double-counting occurs when a court applies an enhancement that duplicates a necessary element of the underlying conviction, or when a court applies two enhancements that the Guidelines intend to make non-cumulative. *United States v. Smith*, 719 F.3d 1120, 1123-25 (9th Cir. 2013). Here, an element of the underlying offense is using "the mail or any facility or means of interstate or foreign commerce" to entice a minor victim into engaging in illicit sexual conduct. The jury instructions for this offense specifically provided that "[t]ransmission of communications by means of a cell phone or Internet constitutes the use of a facility of interstate commerce." ECF No. 311 (Final Jury Instructions), p. 25. Indeed, all the evidence presented at trial to support this conviction constituted messages sent with a computer (i.e., a tablet or smart phone). See §2G1.3, cmt. 1 ("'Computer' has the meaning given that term in 18 U.S.C. § 1030(e)(1).") Thus, Mr. Telles's use of Clash of Clans and KIK Messenger to communicate with T.B. on his computer devices is the central element of the underlying offense. Adding the enhancement for use of a computer constitutes plain double-counting.

5

*Defendant's Sentencing Memorandum, Case Nos. 4:16-cr-00424-JSW*

Case 4:16-cr-00424-JSW     Document 381     Filed 06/12/19     Page 8 of 26

In addition, because Mr. Telles was convicted of Online Enticement, the base offense level is 28 instead of 24. USSG §2G1.3(a)(3). If the conviction were for Counts Two or Three (Travel with Intent to Engage in Illicit Sexual Conduct, 18 U.S.C. § 2423(b), or Engaging in Illicit Sexual Conduct in Foreign Places, 18 U.S.C. § 2423(c)), then the base offense level would have been 24. USSG §2G1.3(a)(4). Thus, in effect, Mr. Telles is already receiving a four-level enhancement for committing Online Enticement, and is also subject to a 10-year mandatory minimum for this conviction. This, too, supports the argument that piling on another two-level enhancement for use of a computer constitutes impermissible double-counting.

**2.     Obstruction of Justice Enhancement Is Not Supported by the Facts.**

Defendant objects to the two-level enhancement under USSG §3C1.1 for obstruction of justice related to his alleged attempt to reroute his flight to Puerto Rico. PSR ¶ 42. This evidence was not presented or proven at trial, and there is no evidence of defendant's intent with respect to this allegation. As such, it is not sufficiently reliable to support an enhancement.

An enhancement for obstruction of justice is proper if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." USSG §3C1.1. Examples of conduct *not* ordinarily covered include: "providing a false name or identification document at arrest, except where such conduct actually resulted in a significant hindrance to the investigation or prosecution of the instant offense," "making false statements, not under oath, to law enforcement officers," and "avoiding or fleeing from arrest." USSG §3C1.1, cmt. 5. Here, Mr. Telles was said to have simply "asked" the UK Immigration and Removals Team to change his return flight to Puerto Rico. PSR ¶ 31. This did nothing to actually hinder the prosecution, and is akin to the examples above that do not rise to the level of "obstruction of justice." Without more, this is not enough to warrant the enhancement under §3C1.1.

Defendant further objects to the alternative basis for the enhancement provided by the government in its response to the draft PSR: that during the trial, Mr. Telles made attempts to

6

*Defendant's Sentencing Memorandum, Case Nos. 4:16-cr-00424-JSW*

disrupt the court proceedings and attempted to communicate with and influence the victim, T.B. PSR ¶¶ 36, 37, 52.

The government bears the burden of proving that this adjustment applies. *United States v. Ameline*, 409 F.3d 1073, 1086 (9th Cir. 2005) (*en banc*). The government must show that the allegedly obstructionist conduct "(A) occurred with respect to the investigation, prosecution, or sentencing of the defendant's instant offense of conviction, and (B) related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) an otherwise closely related case, such as that of a co-defendant." USSG §3C1.1 & cmt. l; see also *United States v. Wright*, 37 F.3d 358,362 (7th Cir. 1994) ("To constitute obstruction it is necessary, however, that the attempt to influence be 'improper,' that is having a natural tendency to suppress or interfere with the discovery of truth.")

Here, the actions described in the PSR related to Mr. Telles's actions during the trial— even if assumed to be true—had no tendency to suppress or interfere with the discovery of truth. Again, assuming *arguendo* that Mr. Telles voluntarily absented himself from the court proceedings, these actions were desperate and misguided attempts to avoid being present in the courtroom. There is no evidence that they were intended to interfere with the prosecution or hinder the progression of the trial. Indeed, after conducting a hearing at which doctors and healthcare professionals testified regarding Mr. Telles's condition, the Court ordered that the trial continue in defendant's absence.

Defendant is cognizant of the Court's ruling regarding these incidents as stated in its *Order Denying Defendant's Motion for Judgment of Acquittal and for New Trial*. ECF No. 368. Nonetheless, Mr. Telles respectfully reiterates his position (as stated in his *Motion for Judgment of Acquittal and New Trial* at ECF No. 312) that he did not engage in these acts willfully or consciously, and submits that they were a product of his recurring mental disorders rather than an intentional obstruction of justice. These include defendant's appearing in jail garb on the first day of jury selection on October 10, 2018, his involuntary absence from the first day of trial on October

7

*Defendant's Sentencing Memorandum, Case Nos. 4:16-cr-00424-JSW*

17, 2018, and his involuntary medical event witnessed by the jury and subsequent absence from trial on October 23, 2018.

With regard to his alleged efforts to communicate with T.B. across the courtroom, the defense objects to the statements provided by the law enforcement agent that Mr. Telles took out his ponytail and fluffed out his hair, which "gave the impression he was trying to make his appearance as different as possible from when the victim last saw him with short hair." PSR ¶ 37. This is pure speculation and conjecture, and is wholly inappropriate as a basis for a significant Guidelines enhancement for obstruction of justice. Similarly, the allegation, as reported by law enforcement agents and T.B., that Mr. Telles "mouthed 'I love you'" to T.B. both before her testimony and during the reading of the verdict and had a "threatening look on his face" does not constitute obstruction under the Guidelines. First, any alleged communication with T.B. after her testimony could not have impeded the prosecution because she had already testified; thus, it could not have been intended to dissuade her from testifying. Second, the impact this action had on T.B.—as interpreted by the case agents—is inconsequential; what matters is Mr. Telles's intention. Third, feelings or speculative opinions by a non-party have no bearing on the offense conduct and are not relevant to sentencing. Probation officers are mandated to "report what happened" during the offense "in a chronological narrative format." *Guide to Judiciary Policy*, Vol. 8D, Ch. 3 § 330.25(a), (b). The PSR is to be based on the officer's "independent" investigation rather than a "recitation of the government's version of events[.]" *Id.* Indeed, this speculative opinion was inserted only after the government responded to the draft PSR. As such, paragraph 37 has no place in the PSR and should be stricken.

### 3. Mr. Telles Is Not a "Repeat and Dangerous Sex Offender Against Minors."

Defendant objects to the substantial five-level enhancement under §4B1.5(b)(1). The title of this enhancement is "Repeat and Dangerous Sex Offender Against Minors" and applies where the "defendant engaged in a pattern of activity involving prohibited sexual conduct." This guideline is intended to identify "repeat sex offenders" who pose "a continuing danger to the public." See USSG §4B1.5 cmt. background. "For purposes of subsection (b), the defendant

8

engaged in a pattern of activity involving prohibited sexual conduct if on at least two separate occasions, the defendant engaged in prohibited sexual conduct with a minor." USSG §4B1.5, cmt. 4(B). The only justification in the PSR for this significant enhancement is that "defendant engaged in repeated sex acts with the 14-year-old victim over a period of two days." PSR ¶ 52.

The purpose of Chapter Four (Criminal History and Criminal Livelihood) is to address the risks posed by repeat or career offenders. The introductory commentary provides,

> A defendant's record of past criminal conduct is directly relevant to those purposes. A defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment. General deterrence of criminal conduct dictates that a clear message be sent to society that repeated criminal behavior will aggravate the need for punishment with each recurrence. To protect the public from further crimes of the particular defendant, the likelihood of recidivism and future criminal behavior must be considered. Repeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation.

The cases where courts have upheld the enhancement under §4B1.5(b)(1) are markedly distinguishable from Mr. Telles's case. The enhancement typically has been applied in cases where the defendant has engaged in repeated sexual acts against minors on separate occasions across several months or years and/or against multiple victims. See, e.g., *United States v. Broxmeyer*, 699 F.3d 265, 272 (2d Cir. 2012) (numerous other sexual assaults by defendant on teenage field hockey players across 15 years); *United States v. Wright*, 540 F.3d 833, 846 (8th Cir. 2008) (victim testified that defendant raped him "five or six times" starting when he was about five or six years old and continuing until he was about 11); *United States v. Phillips*, 431 F.3d 86, 93 (2d Cir. 2005) (pattern evidenced by crime of conviction plus un-adjudicated act of sex abuse committed when defendant was a juvenile); *United States v. Sharpfish*, 408 F.3d 507, 511 (8th Cir. 2005) (defendant had sexually abused one minor victim "often and repeatedly" in addition to abusing another minor victim at least once); *United States v. Starr*, 486 F.Supp.2d 940 (N.D. Iowa 2007) (defendant committed child pornography offenses against two minors whom defendant caused to make and send child pornography on at least two occasions).

9

*Defendant's Sentencing Memorandum, Case Nos. 4:16-cr-00424-JSW*

Here, the conduct was confined to one occasion (albeit over two days) with one victim, which also formed the basis for the convictions. This does not constitute "two *separate* occasions" as contemplated under the guideline, and certainly is not enough to warrant this severe five-level enhancement for "repeat offenders." Mr. Telles has no criminal history whatsoever, and there is no evidence that he ever engaged in this kind of conduct before. He is simply not the type of repeat offender for whom this guideline was intended.

### 4.    Mr. Telles Is Eligible for a Downward Departure for His Mental Condition.

The Sentencing Guidelines provide that "[m]ental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." USSG §5H1.3. As described more fully in section II(C)(3) below, Mr. Telles's impaired mental condition is clearly present to an unusual degree that distinguishes this case from typical cases.

### 5.    Mr. Telles Is Eligible for a Downward Departure Based on Time Served in England.

As the PSR recognizes, defendant was prosecuted in England after his arrest on June 17, 2014, and was sentenced to six years in English custody on November 6, 2014. On October 20, 2016, he was deported to the United States to face the instant charges, which involve the exact same incident, conduct, and evidence. He served approximately 29 months in English custody. This time does not formally count under the rules for BOP credits. See 18 U.S.C. § 3585; BOP Program Statement 5880.28 ("Credit will not be given for any portion of time spent serving another sentence regardless of whether the sentence is federal, state, or foreign.") However, it certainly forms the basis for a downward departure under USSG §5G1.3 and/or a variance under 18 U.S.C. § 3553(a).

Under the Guidelines, a downward departure may be appropriate "if the defendant (1) has completed serving a term of imprisonment; and (2) subsection (b) of §5G1.3 … would have provided an adjustment had that completed term of imprisonment been undischarged at the time

10

of sentencing for the instant offense. Any such departure should be fashioned to achieve a reasonable punishment for the instant offense." USSG §5K2.23. Under §5G1.3(b)(1), if "a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction …, the court shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons …." USSG §5G1.3(b)(1).

Here, the offenses for which Mr. Telles served 29 months in England were based on the exact same conduct that forms the basis for the present convictions, and thus plainly constitutes relevant conduct under §1B1.3.

Courts often grant departures to give credit for time served on related state sentences. *See*, *e.g.*, *United States v. White*, 354 F.3d 841 (9th Cir. 2004) (district court has authority to grant departure for time served on prior sentence under §5G1.3); *Ruggiano v. Reish*, 307 F.3d 121 (3d Cir. 2002) (same); *United States v. Gonzalez*, 192 F.3d 350 (2d Cir. 1999) (same); *United States v. Pray*, 373 F.3d 358 (3d Cir. 2004) (departure awarded to account for four months of state time for related drug offense); *United States v. Sanchez-Rodriguez*, 161 F.3d 556, 563-64 (9th Cir. 1998) (*en banc*) (district court acted within its discretion in departing downward by three levels in illegal reentry case because delay in bringing federal charge prejudiced defendant's opportunity to obtain sentence concurrent to state sentence he was already serving); *United States v. Blackwell*, 49 F.3d 1232, 1241-42 (7th Cir. 1995) (authorizing downward departure to achieve effect of concurrency with fully discharged sentence).

On this basis, the defense respectfully requests that the Court depart downward by 29 months in sentencing Mr. Telles.

**6.     Summary of Proper Offense Level.**

Based on the foregoing, Mr. Telles's offense level should be as follows:

| | |
|---|---|
| 28 | Base Offense Level (USSG §2G1.3(a)((3)) |
| +2 | Misrepresentation of Identity (USSG §2G1.3(b)(2)(A)) |
| +2 | Sex Act (USSG §2G1.3(4)(A)) |
| =32 | Total Offense Level |

11

*Defendant's Sentencing Memorandum, Case Nos. 4:16-cr-00424-JSW*

A total offense level of 32 corresponds to an advisory range of 121 to 151 months. Applying a departure credit for the 29 months served in England, the range is 92 to 122 months. The defense's request for the 10-year mandatory minimum sentence falls at the high end of this advisory range and is thus presumptively reasonable.

## C.    RELEVANT CHARACTERISTICS AND FACTORS SUPPORTING A VARIANCE.

In order to impose a sentence that is sufficient but not greater than necessary, the Court must consider not only the facts surrounding the offense, but also the history and characteristics of the defendant and the specific goals of sentencing. See 18 U.S.C. § 3553(a).

In the event the Court disagrees with the defense's Guidelines calculation, the defendant respectfully submits that numerous characteristics and factors support a downward variance under section 3553(a), as specifically recognized by the Probation Officer. PSR ¶ 113 and Sentencing Recommendation (variance warranted due to the defendant's Autism Spectrum Disorder (ASD) diagnosis; the 2.25 years of custody time served in England; his gullibility associated with his ASD; trauma from his wife's death; his supportive parents; role as dedicated father of two successful children; lack of criminal history; and his stable employment history).

### 1.    Aberrant Conduct

The Court may grant a downward variance where it appears that the defendant's criminal conduct was a marked deviation from an otherwise law-abiding life. *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009).

In *Autery*, the Ninth Circuit found that the district court's *sua sponte* variance to probation from a Guidelines range of 41 to 51 months for possession of child pornography was reasonable in part because it was the defendant's first conviction and the fact that his placement in Criminal History Category I "did not fully account for his complete lack of criminal history" because a defendant with a minor criminal history also falls into Category I. *Id.* at 874. The court also found that defendant did not "fit the profile of a pedophile" and noted defendant's other positive

12

*Defendant's Sentencing Memorandum, Case Nos. 4:16-cr-00424-JSW*

characteristics such as having no history of substance abuse, being motivated and intelligent, and having the support of family as attributes that "undoubtedly constitute 'history and characteristics of the defendant'" justifying a variance below the Guidelines. *Id.*; see also *United States v. Rojas-Millan*, 234 F.3d 464, 474 (9th Cir. 2000) (sentencing court has authority to depart downward for aberrant behavior); *United States v. Dickey*, 924 F.2d 836, 838 (9th Cir. 1991) (first offense may constitute a single act of truly aberrant behavior justifying a downward departure); *United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009) (*en banc*) (variance to probation reasonable in part because of defendant's minimal criminal record); *United States v. Duane*, 533 F.3d 441 (6th Cir. 2008) ("Because Duane had zero points at age 57, he might plausibly argue that even category I—which applies when a defendant has zero or one criminal history point(s)—overstated his criminal history to some degree.").

Similarly, in *United States v. Huckins*, 529 F.3d 1312 (10th Cir. 2008), the Tenth Circuit upheld a variance from a Guidelines range of 78 to 97 months to a sentence of 24 months in part because it was defendant's first conviction. The court rejected the government's argument that the Guidelines already consider this by placing defendant in Criminal History Category I: "[A]lthough the Guidelines discourage granting a downward departure based upon criminal history when the defendant has been placed in a criminal history category of I, this is a not a departure case, it is a variance case. And, after *Gall* and *Kimbrough*, a factor's disfavor by the Guidelines no longer excludes it from consideration under § 3553(a). Therefore, a district court may weigh a defendant's lack of a criminal record, even when the defendant has been placed into a criminal history category of I, in its § 3553(a) analysis." *Id.* at 1318 (internal citations omitted); see also *Recidivism and the "First Offender,"* Report of the United States Sentencing Commission, May 2004 ("The analysis [of empirical data on reoffending] delineates recidivism risk for offenders with minimal prior criminal history and shows that the risk is lowest for offenders with the least experience in the criminal justice system. *Offenders with zero criminal history points have lower recidivism rates than offenders with one or more criminal history points. Even among offenders with zero criminal*

13

*Defendant's Sentencing Memorandum, Case Nos. 4:16-cr-00424-JSW*

*history points, offenders who have never been arrested have the lowest recidivism risk of all.*" (emphasis added).)

Like the defendant in *Autery*, Mr. Telles exhibits the positive characteristics that were identified by the Ninth Circuit as supporting a finding of aberrant conduct and thus a basis for a downward variance below the Guidelines range. These characteristics include no prior criminal record or arrests whatsoever at the time of the offense at 38 years old, no history of substance abuse, various indicators revealing that he is a motivated and intelligent individual, and clear support from his parents and children. See *Autery* at 874.

Accordingly, where Mr. Telles's offense conduct represented a marked deviation from an otherwise law-abiding life, a substantial downward variance is appropriate.

**2.      Low Risk of Recidivism**

A downward variance is also justified by a finding that the defendant presents a low risk to reoffend and thus a lengthy term of incarceration (with its heavy cost to taxpayers) is not truly necessary to protect the public or to act as a deterrent. *United States v. Wadena*, 470 F.3d 735 (8th Cir. 2006) (variance from 18-24 months to probation for 67-year old defendant convicted of mail fraud was proper in part because "Wadena's age and recent deterioration in his health reduce the risk of reoffending, however, as do the terms of his probation"); *United States v. Edwards*, 595 F.3d 1004 (9th Cir. 2010) (defendant convicted of bankruptcy fraud with Guidelines range of 27-33 months; court upheld sentence of probation with seven months house arrest in part because "Section 3553(a) … does not require the goal of general deterrence be met through a period of incarceration."); see also *Recidivism and the "First Offender," Report of the United States Sentencing Commission, supra*.

Mr. Telles is 43 years old with no criminal history whatsoever. This alone suggests that he is at a low risk for recidivism and is a sound basis for the Court to vary downward below the Guidelines range. See Sealed Exhibit A (Confidential Report of Psychological Evaluation by Jeremy Coles, Ph.D.), p. 8 (concluding that Mr. Telles does not have a pedophilic disorder or even

14

*Defendant's Sentencing Memorandum, Case Nos. 4:16-cr-00424-JSW*

pedophilic urges, i.e. urges towards prepubescent children, and that Mr. Telles's risk of reoffending is low).

### 3.     Mental Defects and Disorders

Mr. Telles has been diagnosed with various mental disorders throughout his life. His mother advised that when Mr. Telles was a child, she noticed issues which she later identified as "obsessive-compulsive" behaviors such as excessive hand-washing. She reported Mr. Telles attended therapy for 6 to 12 months when he was approximately 16 years old, at which time he was diagnosed with OCD. While his mother encouraged him to try medication for his OCD, he was not receptive to that idea. PSR ¶ 77. Mr. Telles also indicated he saw a therapist for his "autism and OCD" during his divorce proceedings and attended family counseling with his children. PSR ¶ 76.

Mr. Telles's mother further recounted some of his sensory sensitivities and behaviors. "He had exquisite tactile sensitivities to sock seams, shoes, pants waistbands and shirt collars. He repeatedly chewed on his shirt collars, re-wore the same unlaundered clothing, and avoided having his hair cut because it bothered him. He was not only interested in playing with Legos and video games, but he was also fascinated with collecting rocks from outside and paper cups and napkins from school parties." PSR ¶ 78. His mother advised that "he was avoidant of social activities and did not have many friends compared to his younger brother. He appeared to love animals more than he did people. The defendant only had one friend at a time during his school years, and in his younger years, he had a friend who reportedly had the same challenges with socializing as the defendant." PSR ¶ 79.

Mr. Telles was also diagnosed with a learning disability in kindergarten. "He had an Individualized Education Program due to his poor reading abilities and limited social communication. He worked with a speech therapist to improve his articulation, stuttering and social engagement. He was eventually diagnosed with dysgraphia (problem with writing) and dyslexia (impaired reading) in the setting of a 'normal' IQ. He attended local public school in California and was held back in the 3rd grade because of his learning issues. When the family

15

moved to Connecticut for five years, where he repeated the 3rd grade, he appeared to function in a smaller classroom. Because of his learning disabilities and bullying by other kids, his parents kept him in a private school in Connecticut. He was formally evaluated for his learning needs again during his middle school years. His IQ was said to have been normal; however, his parents did not recall the score. Mr. Telles was reportedly good at 'spatial awareness' and math but struggled with spelling and reading. He had a resource aid counselor assigned to him during that time." PSR ¶ 85. When the family moved back to California, the defendant attended the public high school in Pleasanton. His parents stated the defendant "barely graduated" and had to keep retaking a "language capacity" test. PSR ¶ 86.

Mr. Telles related a history of being bullied and not relating well to his peers during his school years. "He stated kids picked on him due to his stuttering and how he dressed. When he was a teenager, he wore a brown leather coat with a hood through the year because it felt good on his skin and helped shield him from light, noise and visual stimulation in the environment. He avoided dances and parties because he did not drink or use drugs and did not care for noisy, crowded settings." PSR ¶ 87.

According to the Forensic Psychiatric Evaluation by Denis C. Kellaher, D.O., based upon the available information and according to the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM-5), Mr. Telles was diagnosed with Autism Spectrum Disorder, requiring support in social communication and in repetitive, restricted pattern behavior; and Specific Learning Disorder, with impairments in reading and written expression. PSR ¶ 80. In the report's conclusion, it was determined Mr. Telles met the criteria for a primary ASD diagnosis, a mental defect that has affected him since early childhood and as evidenced by social impairments, rituals, highly focused interests, and cognitive-behavioral inflexibility. "His ASD interfered with his ability to knowingly plan and perpetrate the alleged offense with a specific intention and for primary gratification. Treatment to target sensory, cognitive and behavioral issues to address his ASD vulnerabilities is highly recommended. Appropriate custodial supervision to manage his safety given his social vulnerabilities is strongly urged." PSR ¶ 81.

*Defendant's Sentencing Memorandum, Case Nos. 4:16-cr-00424-JSW*

Relatedly, the gullibility associated with ASD is another factor to consider in determining an appropriate sentence. Mr. Telles has consistently maintained that he actually believed the fantastical stories T.B. told him and believed she desperately needed his help. This is evidenced by his statements to the UK probation officer on June 20, 2014, reciting the sordid sequence of events that T.B. had laid out in their text communications. PSR ¶ 24. While perhaps not reasonable for most functioning adults, this gullibility is typical for someone with ASD. This, too, forms the basis for a downward variance.

In his more recent evaluation of Mr. Telles, Dr. Jeremy Coles, Ph.D., opined:

> Diagnostically, I think it is safe to say that Mr. Telles suffers with OCD and has for a large portion of his life. This, at least in part, accounts for the vast paperwork that he brought to the evaluation room, some of which was hand written triplicates of letters to his attorney. It also accounts for his hoarding behaviors. As noted, the deputies indicated they had never seen someone hoard to the degree that Mr. Telles did and, according to the Presentence Report, his house was cluttered to the degree that they were unable to access some of the rooms. The etiology of obsessive compulsiveness varies but it is always a maladaptive defense structure aimed at warding off deep anxieties. Suffice it to say, for Mr. Telles, things are not running smoothly in his internal world and he exerts most of his mental energy just trying to keep it together.

> Psychodynamically, there is clearly a self-destructive propensity to Mr. Telles' behavior. I do not need to inform any party in this case of the ongoing self-destructive behaviors that Mr. Telles has engaged in throughout the course of the case. He has alienated virtually every person involved in the case including myself. His actions have often been meanspirited and could only lead to bad things for him and, confounding the picture, I am not in agreement that he simply does not understand cause and effect in the social realm. And yet, it is extremely difficult to get clear on the psychological meaning and origin of his destructive behavior because he is not a psychopath (truthfully, if he were he would probably have already worked on developing allies in the current matter) and he is not even particularly anti-social; he has not lived a criminal lifestyle and, beyond the controlling offenses, the social behavior that he has engaged in has generally been prosocial...and yet in the current situation we would all like to ring his neck.

17

*Defendant's Sentencing Memorandum, Case Nos. 4:16-cr-00424-JSW*

> Overall, my impression of Mr. Telles is that he is a deeply disturbed man. I do not know if the severe psychological problems that he suffers with are related to his behavior at the time of the controlling offense. I do think he is a socially inept man who has a very underdeveloped and misguided relationship with the social world. …
>
> In summary, Mr. Telles is a psychologically disturbed young man, apparently hell bent on alienating everyone in his path during the current proceedings. The reasons for his behavior are somewhat enigmatic. While his social ineptitude predates his current case and is most likely rooted in a severely disturbed psychological profile, his behavior never took this form until now. Absent an interview and full evaluation, I have no ability to say more about his mental functioning with any level of psychological probability. However, from a purely actuarial vantage point, he is at low risk for committing another sex offense...his recent alienating behavior notwithstanding.

Sealed Exhibit A (Confidential Report of Psychological Evaluation), pp. 7-8.

Mr. Telles does not present this history and analysis as an excuse for his behavior, but it is clearly a factor to consider when looking at how and why Mr. Telles's offense conduct came to pass and whether a variance below the Guidelines range is appropriate.

Many courts have supported a downward variance based on mental health concerns. See, e.g., *United States v. Garcia*, 497 F.3d 964, 971-72 (9th Cir. 2007) (where defendant convicted of drug conspiracy, sentence of 100 years vacated in part because district judge erred in holding it had no power to consider to defendant's drug addiction and resulting mental impairment as a mitigating factor under 18 U.S.C. § 3553(a): "Just because a consideration was improper under the mandatory Guidelines regime does not mean that it is necessarily improper under the advisory Guidelines regime. ... We agree with our sister circuits and hold that district courts are not prohibited in all circumstances from considering a defendant's drug addiction in choosing a reasonable sentence."); *United States v. Ruff*, 535 F.3d 999 (9th Cir. 2008) (where defendant pled guilty to embezzling $650,000 from non-profit organization over course of three years, and where Guidelines range was 30-37 months, sentence of one day in jail and supervised release for three years on condition defendant spend one year in community treatment center to go to work and obtain counseling was not unreasonable in part because defendant "would clearly benefit from

18

continued mental health treatment"); *United States v. Vieke,* 348 F.3d 811 (9th Cir. 2003) (crime committed because of "pathological nature of the [gambling] addiction" and was "totally out of suit with the rest of her life and the behaviors" even though fraud went on for years); *United States v. Thompson*, 315 F.3d 1071 (9th Cir. 2002) (Berzon, J. concurring) (district court should consider departure for diminished capacity).

Thus, Mr. Telles submits that the Court should impose a downward variance in light of Mr. Telles's documented and obvious mental defects and disorders.

### 4.    Traumatic Past

The Ninth Circuit has held that "[w]here a defendant's crime is attributable to a disadvantaged background or emotional or mental problems the defendant is less culpable than one without the excuse." *Landrigan v. Schriro*, 441 F.3d 638, 648 (9th Cir. 2006); *United States v. Floyd*, 945 F.2d 1096 (9th Cir. 1991) (departure based on defendant's abandonment by his parents and lack of guidance as a youth).

Here, Mr. Telles's mother reported that, when Mr. Telles was three years old, he was placed in play therapy for 6 to 10 sessions following an incident of molestation. PSR ¶ 77. The details of this incident are unknown, but it is safe to say that any experience of molestation at such a young age would have a lasting and devastating impact.

In addition, the mysterious and tragic death of his mentally ill wife during their divorce proceedings—whether an intentional or accidental overdose—was a traumatic event for Mr. Telles. Marjorie had been his only partner or lover in his life, and the couple had young children at the time (Anabel was 5 and Austin was 3).

The internalized suppression of negative emotions often leads to destructive behaviors. In light of these factors, the Court may properly grant a downward variance. *Ibid.*

### 5.    Support of Family

Mr. Telles has two children aged 20 and 18 years. His daughter is an accomplished student at Georgetown University in Washington, D.C., and his son was recently accepted to several fine

19

*Defendant's Sentencing Memorandum, Case Nos. 4:16-cr-00424-JSW*

colleges including Vanderbilt and University of Southern California (USC) despite struggling with his own learning difficulties and mental health conditions. PSR ¶ 69. The Probation report recognizes that Mr. Telles was "a 'doting father' who was often 'paranoid' about the kids getting sick. He attended most of his children's school functions and was observed having a loving relationship with them." *Id.* Indeed, the record of Mr. Telles's many jail calls and video visits reflects the close relationship he has with his children. Mr. Telles's parents also remain supportive despite the many challenges they have encountered in maintaining a relationship with Mr. Telles throughout this ordeal.

(As yet another example of Mr. Telles's consistently self-defeating behavior, the primary reason that the defense is not submitting letters of support with this memorandum is that Mr. Telles may have instructed his family not to cooperate with defense counsel in preparing for sentencing.)

The defense respectfully asks the Court to consider the fact that a shorter period of incarceration will have a lesser adverse impact on Mr. Telles's innocent children as grounds for a mitigated sentence, as well as the fact that his family's support indicates a lower risk of recidivism. See, e.g., *United States v. Sayad*, 589 F.3d 1110, 1113 (10th Cir. 2009) (variance from 57 months to probation based in part on strong family support); Shirley R. Klein *et al., Inmate Family Functioning*, 46 Int'l J. Offender Therapy & Comp. Criminology 95, 99-100 (2002) ("The relationship between family ties and lower recidivism has been consistent across study populations, different periods, and different methodological procedures."); Phyllis J. Newton, Jill Glazer, & Kevin Blackwell, *Gender, Individuality and the Federal Sentencing Guidelines*, 8 Fed. Sent'g Rep. 148 (1995) ("[T]he better family ties are maintained[,] the lower the recidivism rate."); see also *United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) (downward variance in child porn case from 78-97 months to 42 months affirmed in part because defendant "is a good parent," which is a "valid consideration under § 3553(a)"); *United States v. Aguirre*, 214 F.3d 1122 (9th Cir. 2000) (pre-*Booker* case where Ninth Circuit departed downward four levels based on fact that 8 year-old son had lost a father and would be losing a mother for a substantial period of time); *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) ("The district court clearly believed that, in

20

this case, the potential harm to the close relationship between this single parent and her child outweighed the benefits of a prolonged period of incarceration to achieve deterrence, protection of the public, and punishment.")

This familial support indicates a low likelihood of recidivism and underscores the fact that the offense conduct was clearly aberrant and entirely out of character for Mr. Telles. Thus, a downward variance is appropriate.

### 6.    Excellent Employment History

A defendant's strong employment history may be a basis for a downward variance. In *United States v. Ruff*, 535 F.3d 999 (9th Cir. 2008), defendant's Guidelines range was 30 to 37 months for embezzling $650,000 from a nonprofit organization over the course of three years. The district court varied downward and sentenced him to one day in jail and supervised release for three years on condition that defendant spend one year in a community treatment center so he could continue to go to work and obtain counseling. The Ninth Circuit found this sentence was reasonable in part because of the defendant's "history of strong employment." *Ruff* at 1001; see also *United States v. Alba*, 933 F. 2d 1117 (2d Cir. 1991) (departure based on long-standing employment at two jobs); *United States v. Jagmohan*, 909 F.2d 61 (2d Cir. 1990) (exceptional employment history); *United States v. Big Crow*, 898 F.2d 1326, 1331-32 (8th Cir. 1990) (excellent employment record).

Here, Mr. Telles was gainfully employed until the offense conduct at the age of 38. PSR ¶¶ 88-89. He had been self-employed for 10 years performing hardwood floor installation and carpet cleaning services. Prior to that, he had been employed in the construction field since high school. *Id.*

In light of Mr. Telles's exemplary employment history, there is good cause for the Court to grant a downward variance.

*Defendant's Sentencing Memorandum, Case Nos. 4:16-cr-00424-JSW*

1

### 7.    Collateral Consequences in Addition to Incarceration

2

Mr. Telles's offense conduct has resulted not only in his arrest and prosecution in this case,

3

but also in serious collateral consequences that he (and his family) will have to live with for the

4

rest of his life. Just some of these include lifetime sex offender registration, all the limitations that

5

come with being a convicted felon, carrying the stigma of a sexual offender against a minor, loss

6

of income, and suffering permanent damage to his reputation.

7

Such collateral consequences can form the basis for a variance. See, e.g., *United States v.*

8

*Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (variance upheld where defendant "already suffered

9

substantially due to the criminal investigation"); *United States v. Anderson*, 533 F.3d 623 (8th Cir.

10

2008) (variance upheld where district court "specifically addressed other ways in which the

11

defendant had suffered atypical punishment such as the loss of his reputation and his company, the

12

ongoing case against him from the Securities and Exchange Commission and the harm visited

13

upon him as a result of the fact that his actions brought his wife and friend into the criminal justice

14

system."); *United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) ("The district court also found

15

that Pauley warranted a lower sentence because he lost his teaching certificate and his state pension

16

as a result of his [child pornography] conduct."); *United States v. Crook*, 9 F.3d 1422, n.7 (9th Cir.

17

1993) (civil forfeiture of property, in combination with other specific offender characteristics,

18

might form basis for mitigated sentence).

19

Indeed, lifetime sex offender registration has been recognized as a significant collateral

20

consequence of a conviction. See *United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008)

21

(noting it was appropriate for the district court to consider, under § 3553(a), the "lasting effects of

22

being required to register as a sex offender").

23

Additionally, Mr. Telles will now have a federal felony conviction on his record that can

24

<u>never</u> be expunged or sealed. The magnitude of the impact that this will have on his life, for the

25

rest of his life, cannot be overstated. He will struggle professionally to explain the conviction. He

26

will be disqualified from most forms of public assistance. Courts have recognized that these far-

27

reaching collateral consequences of incurring a felony conviction should be considered by judges

28

when determining an appropriate sentence. See, e.g., *United States v. Smith*, 683 F.2d 1236, 1240 (9th Cir. 1982) ("The stigma of a felony conviction is permanent and pervasive."); *United States v. Nesbeth*, 188 F.Supp.3d 179 (E.D.N.Y. 2016) (variance to probation for drug crime based on collateral consequences); *United States v. Adelson,* 441 F.Supp.2d 506 (S.D.N.Y. 2006) (variance from life to 42 months based in part on fact that "[w]ith his reputation ruined by his conviction, it was extremely unlikely that he would ever involve himself in future misconduct."); see also Ernest Drucker, *A Plague of Prisons* (The New Press 2011), at p. 130 ("Having served their formal sentences, ex-prisoners will endure new forms of punishment capable of generating more anger, more shame, and the scars of permanent social stigma.")

In light of the numerous above-referenced collateral consequences, there are good grounds to grant a downward variance below the Guidelines range.

### 8.    Vulnerability to Abuse and Victimization in Prison

Mr. Telles will be especially vulnerable to abuse and victimization in prison as a result of being a sex offender against a minor, especially in light of the fact that he is 43 years old and this will be the first time he will be incarcerated in a United States prison. His dissociative mental conditions and tendency to create conflict will also make him a target in prison.

In *United States v. Parish*, 308 F.3d 1025 (9th Cir. 2002), the Ninth Circuit upheld an eight-level departure in part because defendant would have "high susceptibility to abuse in prison" because of "his demeanor, his naiveté, and the nature of the offense." See also *United States v. Rausch*, 570 F.Supp.2d 1295 (D.Colo. 2008) (in child porn case with guidelines of 120 months, court sentenced defendant to one day in jail in part because of "client's vulnerability to victimization in prison as an unnecessary and unacceptably high risk … [I]t is clear that violence against inmates, especially sex offenders, does occur and that vulnerable inmates are at greater risk of violence than typical inmate populations."); *United States v. Wilke*, 995 F.Supp. 828 (N.D. Ill. 1998) (testimony by prisoner-turned-professor persuaded court that defendant's appearance and conviction of sex offense involving juveniles subjected him to physical abuse in prison and warranted four-level departure); *United v. Shasky*, 939 F.Supp. 695 (D. Neb. 1996) (downward

23

*Defendant's Sentencing Memorandum, Case Nos. 4:16-cr-00424-JSW*

departure for receiving material via computer involving pornographic images of minors was granted based on defendant's unusual susceptibility to abuse in prison as a homosexual state trooper of diminutive stature and weight).

The National Prison Rape Elimination Commission, in a study released on June 24, 2009, reports "an estimated that 60,500 State and Federal prisoners were sexually abused during [2006]." See Executive Summary at http://nprec.us/publication/report/executive_summary.php; Jeannie Suk, *Redistributing Rape*, 48 American Criminal Law Review at 111 (Winter, 2011) ("Prison is hell. If there is anything in today's United States that may approximate Hobbes' state of nature, where men live in continual fear and danger of violent death by other men, and security is whatever man's own strength and invention enables, it must be the modern prison. There, the war of all against all is not merely chaos, but, rather, reveals consistent patterns as the stronger inevitably subordinate the weaker. One such undeniable pattern is the central and routine place of rape and its threat in the social system of the prison.").

In light of Mr. Telles's vulnerability to abuse and victimization in prison, the Court should grant a downward variance under 18 U.S.C. § 3553(a) or a departure under the Guidelines' "catch-all" provision. See USSG § 5K2.0(b).

## III.    CONCLUSION

A sentence tempered with reason and a below-Guidelines variance is appropriate here. Mr. Telles respectfully submits that 10 years in federal prison is enough time to punish him and to achieve the goals of sentencing under the Bail Reform Act.

Dated: June 11, 2019                              Respectfully submitted,

                                                    /s/
                                                  MICHAEL STEPANIAN
                                                  JENNIFER NAEGELE
                                                  Attorneys for Defendant
                                                  DAVID JOHN TELLES, JR.

24